**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.** 19mj3049-Reid

**UNITED STATES OF AMERICA**

**v.**

**TEDRICK KING, et al.,**
______________________________/

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? ______Yes ___X___ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? __________ Yes ___X___ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: ______________________________

CARY O. ARONOVITZ
Florida Bar # 86425
99 N.E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9131
FAX (305) 530-7976
Cary.Aronovitz@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

United States of America
v.
Tedrick King, Wilhemnia Nottage, Corey Evans, Christopher McCollur, a/k/a "Block," Keyon Harris, and Jonis Webster, a/k/a "J.J."

*Defendant(s)*

Case No. 19mj 3049-Reid

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of October 18, 2018 to June 13, 2019 in the county of Miami-Dade in the Southern District of Florida, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC § 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance. |
| 21 USC § 841 | Possession with Intent to Distribute a Controlled Substance. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

SA Jarahn Williams, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 06/28/2019

[signature]
*Judge's signature*

City and state: Miami, Florida

Lisette M. Reid, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jarahn Williams, Special Agent of the Drug Enforcement Administration ("DEA"), being duly sworn, hereby state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent with the DEA since 2014 and I am currently assigned to the Miami Field Division, Homestead Resident Office. In connection with my official DEA duties, I investigate criminal violations of federal narcotics laws, money laundering laws, firearm laws, and other violations of federal law. Upon joining the DEA, I received approximately 18 weeks of training at the DEA Training Academy in Quantico, Virginia. This training addressed the methods by which drug traffickers possess and distribute controlled substances; the manner and means in which they conceal and launder the proceeds from the distribution of controlled substances; the manner and means in which they protect their proceeds and their controlled substances; and the manner and means by which drug traffickers attempt to avoid law enforcement's detection of their activities.

2. As a Special Agent, I have participated in drug trafficking and money laundering investigations. I have conducted or participated in surveillance, the execution of search warrants, debriefings of informants and witnesses, and reviews of recorded conversations. Prior to becoming a Special Agent, I was a Diversion Investigator with the DEA in Houston, Texas, for approximately three and a half years.

3. During the course of my investigations, I have been the affiant in multiple probable cause affidavits, coordinated the execution of search and arrest warrants, conducted physical surveillance, organized controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and communicated with informants and

subjects, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. Accordingly, I have become familiar with some of the manners in which illegal drugs are imported, distributed, and sold, as well as the methods used by drug dealers to disguise the source and nature of their profits.

4. I am a law enforcement officer within the meaning of Title 21, United States Code, Section 878 and Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations, execute and serve search warrants, and make arrests for offenses enumerated in Titles 18 and 21 of the United States Code, and offenses against the United States.

5. I have not included in the affidavit each and every fact known to me about the matters set forth herein, but only those facts and circumstances that I believe are sufficient to establish probable cause for the requested criminal complaint. The statements in this affidavit are based upon my investigation, information provided by other individuals, including sworn law enforcement officers and confidential sources, and upon my experience and training as a federal agent and the experience and training of other federal agents.

## II. PURPOSE OF AFFIDAVIT AND BACKGROUND

6. I make this Affidavit in support of a criminal complaint charging Tedrick KING ("KING"), Wilhemnia NOTTAGE ("NOTTAGE"), Corey EVANS ("EVANS"), Christopher MCCOLLUR a/k/a "Block" ("MCCOLLUR"), Keyon HARRIS ("HARRIS"), and Jonis WEBSTER a/k/a "J.J." for possession with intent to distribute illegal controlled substances and conspiracy to possess with intent to distribute illegal controlled substances, in violation of Title 21 United States Code, Sections 841 and 846.


7. Since 2017, the DEA, Federal Bureau of Investigation ("FBI"), and the Miami-Dade Police Department ("MDPD") have been investigating KING and his criminal associates (the "KING Enterprise") for crimes including narcotics distribution and money laundering. Since the start of the investigation, law enforcement officers have conducted approximately 30 controlled narcotics purchases from the KING Enterprise, including cocaine, marijuana, and Molly.[1] Law enforcement, through the course of physical surveillance, controlled purchases of narcotics, and debriefs with witnesses, believes that the KING Enterprise is the largest current source of cocaine distribution in the neighborhood of Perrine, located in the Southern District of Florida.

8. The investigation has revealed that the KING Enterprise utilizes multiple locations to distribute narcotics, store narcotics, and conceal the proceeds of the narcotics sales. As further explained below, KING is the primary supplier for a trap house that he controls, located at 10392 SW 173rd Street, Miami, Florida (the "Trap House").[2] NOTTAGE, EVANS, MCCOLLUR, and HARRIS all work or have worked at the Trap House, supplying various narcotics on a daily basis to the Cutler Bay, Perrine, and Homestead neighborhoods. WEBSTER also worked for KING during the course of the conspiracy selling ounce quantities of narcotics to confidential human sources working on behalf of law enforcement.

9. On May 9, 2019, United States District Court Judge Jose E. Martinez, in a sealed application, authorized law enforcement to intercept wire and electronic communications for a period of thirty days from phone numbers (786) 315-7359 ("TARGET TELEPHONE 1"), (786) 907-0538 ("TARGET TELEPHONE 2"), and (305) 755-2126 ("TARGET TELEPHONE 3"). *See*

[1] I know from training and experience that the term "Molly" is used to refer to a street drug that is a form of MDMA, and is typically a Schedule I illegal controlled substance. Molly can come in several different forms but one commonly used formula is 3,4 methylene dioxy-methamphetamine.

[2] I know from training and experience that the term "trap house" is used to refer to a location that can be used for living purposes but is also utilized for dropping off and selling narcotics.

19-wt-20004-JEM. All three of the TARGET TELEPHONES were used by KING on a near daily basis in furtherance of the drug trafficking network. The interceptions started on May 15, 2019 and ended on June 13, 2019.

## III. PROBABLE CAUSE

### i. Controlled Purchases of Narcotics from the KING ENTERPRISE

10. Five controlled purchases of narcotics from the KING Enterprise are listed below. Several of the controlled purchases were conducted at the Trap House located at 10392 SW 173rd Street. Other purchases occurred at a stash house[3] frequently used by the Enterprise located at 10342 SW 173rd Terrace, Miami, Florida (the "Stash House"). The Stash House is also referred to as the "Car Wash" because a mobile car wash van was generally parked outside of the residence and featured TARGET TELEPHONE 2's phone number painted on the outside of the vehicle. Prior to each controlled purchase, the confidential source ("CS") would receive audio and video recording equipment. Law enforcement would then search the CS's person and vehicle for contraband. After the conclusion of the controlled purchase, law enforcement would immediately meet with the CS to take possession of the controlled substance.

#### a. October 18, 2018, Controlled Purchase

11. For example, on October 18, 2018, a narcotics buy walk operation was conducted. During this operation, an FBI confidential human source ("FBI CHS") negotiated the purchase of two ounces of cocaine from KING for the price of $2,600 US currency. Law enforcement surveillance observed KING departing his residence at 10250 SW 173rd Terrace driving a gold Infiniti vehicle. KING stopped at the residence of Subject 1 at 10320 SW 174th Terrace and then continued to the Trap House. Upon arrival at the Trap House, in an audio and video recorded

[3] The term "stash house" is used to refer to a location that can be used for living purposes but is also utilized for receiving, packaging, and storing narcotics for sale and the proceeds from the sale of narcotics.

transaction, KING sold approximately two ounces of suspected cocaine to the FBI CHS for $2,600. After the purchase, KING returned to his residence where it is believed that he stored the $2,600 from the purchase. The suspected cocaine was tested by the MDPD crime laboratory and tested positive for cocaine.

**b. <u>November 2, 2018, Controlled Purchase</u>**

12. On November 2, 2018, a narcotics buy walk operation was conducted. During this operation, an MDPD confidential human source ("MDPD CHS") first negotiated with KING to purchase two ounces of cocaine for $2,600 US currency. In this operation, the MDPD CHS would be working with the FBI CHS to purchase the narcotics from KING. That day, the FBI CHS met with the MDPD CHS at the Trap House located at 10392 SW 173rd Street. The MDPD CHS then called KING and he directed the CHSs to drive to the Stash House. Upon arrival at the Stash House, in an audio and video recorded transaction, KING sold approximately two ounces of suspected cocaine to the FBI CHS for $2,600 US currency.

13. The following is a portion of a transcription of an exchange between the FBI CHS and KING:

> FBI CHS: Let me look at this bitch dog… the sandy the sandy part straight
> KING: Huh, yea yea, everything 100.
> FBI CHS: Cause that last one was straight my nigga
> KING: I know that's the same shit.
> FBI CHS: What this shit weighing?

14. Your Affiant is aware, through training and experience, that the FBI CHS said the "sandy party straight," in which he/she and KING were discussing the quality of the narcotics, and KING was assuring the FBI CHS that "everything 100," meaning it was good quality. The FBI CHS and KING then talked about the weight of the cocaine in the kitchen. The suspected cocaine

purchased by the FBI CHS was tested by the MDPD crime laboratory and tested positive for cocaine.

**c. <u>December 13, 2018, Controlled Purchase</u>**

15. On December 13, 2018, a narcotics buy walk operation was conducted. That day, at approximately 3:30 p.m., the FBI CHS, at the direction of law enforcement, arrived at the Trap House as observed by law enforcement surveillance. The FBI CHS was with the MDPD CHS. The FBI CHS had an audio and video recorder, and the MDPD CHS spoke to KING to arrange the purchase of two ounces of cocaine. During his/her conversation with KING, the CHS's were instructed to wait at "her house," which to the MDPD CHS meant the Trap House where Wilhemnia NOTTAGE presided. As the CHSs waited outside of the Trap House, a male later identified as Keyon HARRIS approached their vehicle and asked what they wanted. The FBI CHS ordered two ounces of cocaine. Below is a summary of the transaction:

Harris: What you say it was
FBI CHS: What happened
Harris: What you say it was
FBI CHS: What you mean
Harris: How much you say it was
FBI CHS: Two of em (referring to two ounces of cocaine)

The FBI CHS's reference to "two of em," meant two ounces of cocaine. HARRIS returned to the vehicle and gave the FBI CHS a brown paper bag containing approximately two ounces of suspected cocaine in exchange for $2,600 US currency. However, the two ounces of suspected cocaine were submitted to the lab for analysis, and tested negative for cocaine.

**d. <u>December 27, 2018 Controlled Purchase</u>**

16. On December 20, 2018, law enforcement attempted to conduct a controlled buy walk operation between a third cooperating source ("CS 3") and Jonis WEBSTER. At approximately 4:48 p.m., CS 3, who had audio and video recording equipment, departed a neutral

location followed by law enforcement. CS 3 arrived at the Stash House located at 10342 SW 173rd Terrace and met with WEBSTER. WEBSTER, utilizing phone number 786-569-7241, then called TARGET TELPHONE 2 and spoke to KING. Your Affiant believes, through training and experience, that WEBSTER called KING to advise him that CS 3 wanted to purchase narcotics because minutes later KING arrived at the location driving a black Chevy pickup truck. Law enforcement observed KING and WEBSTER talking at the black Chevy, and KING then got out of his vehicle and spoke to CS 3, as follows:

WEBSTER: Gonna be an ounce
CS 3: Uh
WEBSTER: Only an ounce
CS 3: Only a zip? [U/I][4] What you talkin' about?
WEBSTER: Uh
CS 3: Lay it on me you said only an ounce?
WEBSTER: Yea
KING: Five
CS 3: Five...so you don't do the sevens?
WEBSTER: No
KING: I do 7s for 2 you know what I'm sayin

Your Affiant is aware that KING, WEBSTER, and CS 3 were discussing Molly prices, and KING was stating that his organization was only selling ounce quantities of Molly from that point on. KING told CS 3 that an ounce of Molly would cost "Five," meaning $500 for an ounce. CS 3 then told KING that CS 3 would return the next week for an ounce of Molly. CS 3 did not make a purchase of Molly that day.

17. On December 27, 2018, CS 3 was equipped with audio and video recording equipment and instructed to complete the controlled purchase of Molly. At approximately 4:20 p.m., law enforcement established surveillance at the Stash House. Subsequently, CS 3 met WEBSTER at the Stash House. CS 3 provided WEBSTER $500 USC and WEBSTER walked

---

[4] U/I means unintelligible.

back into the residence. Moments later, WEBSTER returned and gave CS 3 the narcotics. The following is a transcript of the narcotics exchange:

WEBSTER: 28 grams…. I'm blessed bruh.
CS 3: I don't play fool……..

***

WEBSTER: Aye, gas boy, gas boy… watch when a bitch first smoke that bruh, watch how they come back to ya bruh, so fast bruh…I swear to God bruh….on everything I love bruh
CS 3: Tell fool I'm locked in wit him

In your Affiant's training and experience, and through the course of this investigation, your Affiant understands that "gas" refers to good narcotics, and the reference to "fool" by CS 3 was referring to KING. During the conversation, CS 3 was telling WEBSTER that he is locked in with "fool," meaning he will continue to buy narcotics from WEBSTER and WEBSTER's partner, KING. CS 3 departed the Stash House and returned to the neutral location, where he relinquished the suspected narcotics to law enforcement. The suspected narcotics were later submitted to the lab for analysis and tested positive as 28.06 grams of 4-chloro-N, N-dimethylcathinone and eutylone in combination.[5]

**e. <u>January 31, 2019, Controlled Purchase</u>**

18. On January 31, 2019, law enforcement prepared to conduct a controlled purchase between KING and CS 3, who was equipped with an audio and video recorder, and $500 US currency. CS 3 met with WEBSTER and the two drove together to the Stash House. At approximately 6:41 p.m., law enforcement observed KING's brown Maserati bearing Florida

---

[5] In my training and experience with illegal controlled substances, and based upon information provided by the DEA, Eutylone (1-(1,3-benzodioxol-5-yl)-2-(ethylamino)butan-1-one), as of March 7, 2014, was classified as a Schedule I controlled substance. Eutylone is a positional isomer of pentylone (1-(1,3-benzodioxol-5-yl)-2-(methylamino)pentan-1-one) and it can be mixed with other substances to form what is commonly known as ecstasy or Molly.

license plate JRS-U86 arrive at the Stash House. WEBSTER was then seen exiting CS 3's vehicle and walking towards KING's Maserati. At approximately 6:50 p.m., law enforcement observed WEBSTER get back inside CS 3's vehicle and the two departed the location. CS 3 dropped off WEBSTER and met with law enforcement, where he relinquished one ounce of suspected Molly that he had purchased from KING and WEBSTER for $500. The Molly was later submitted to the lab for analysis and tested positive as 27.53 grams of eutylone.

**ii. <u>Communications Intercepted Over the Wire</u>**

19. As previously indicated, on May 9, 2019, law enforcement, in a sealed application, obtained authorization to intercept wire and electronic communications from the TARGET TELEPHONES. The interception period started on May 15, 2019 and ended on June 13, 2019.

20. On May 15, 2019, at approximately 2:10 p.m., KING, using TARGET TELEPHONE 3, made a call to telephone number 619-496-3340, subscribed to Chris MCCOLLUR, a/k/a "Block," who was working in the Trap House. The following is a transcription of a portion of the conversation between KING and Block:

KING: Hello?
Block: Hello
KING: Yea um, like like like just take a break for about a hour
Block: alright alright
KING: ok
Block: alright
KING: yea cause I cause I see they just pulled somebody down the street in that black truck and that um, green and white came too
Block: oh ok so, so they stopping everybody
KING: yea...but they they all over the place so its not just there
Block: alright ok ok ok

21. During the preceding conversation, your Affiant believes that KING was telling Block that he needed to shut the Trap House down for an hour. KING told Block that someone

was pulled over in Perrine by the police i.e. the "green and white,[6]" and that police were stopping everybody.

22. At approximately 3:30 p.m., on the same date, KING, using TARGET TELEPHONE 3, made an outgoing call to Block to confirm that "Hey you open back right?" to which BLOCK confirmed he had. Your Affiant believes that KING was making sure that BLOCK, who was working in the Trap House, had re-opened once law enforcement had left the area.

23. On May 16, 2019, at approximately 11:00 p.m., KING, using TARGET TELEPHONE 3, made an outgoing telephone call to 786-318-4097, believed to be utilized by Corey EVANS,[7] who is believed to be a worker in KING's trap house. Below is a transcription of a portion of the conversation:

EVANS: hello
KING: yo
EVANS: yo
KING: ummm, why didn't, why didn't, why you tell me that Block [i.e. MCCOLLUR] letting niggas and shit in the house.
EVANS: who they have in there
KING: he had G bug in there, with the dog and another nigga with, umm, and another nigga with a Grey Altima. yesterday, I seen him yesterday, and i'm like what the fuck going on, you know what i'm saying. i'm trying to be what the fuck that was

24. During the preceding call, your Affiant believes that KING was complaining to EVANS in regards to BLOCK letting people into the Trap House. Law enforcement is aware that

---

[6] Your Affiant knows that "green and white" is often used to refer to MDPD marked police cars, which are green and white in color.

[7] On May 31, 2019, MDPD officers were called out to the Trap House due a domestic violence complaint where a witness saw a male beating and dragging a woman by her hair inside of the residence. Upon arrival, the officers ordered the occupants of the residence to come outside. HARRIS, EVANS, and NOTTAGE all came outside and a protective sweep was performed. Importantly, EVANS provided his cell phone number to the officers as 786-318-4097: the number utilized to speak with KING over the TARGET TELEPHONES. NOTTAGE advised the officers that she lived in the Trap House and gave her phone number as 786-227-7349, which is registered in her name and she used to contact KING during the wire interception period. Finally, HARRIS also provided his cell phone number as 786-454-6946, which is subscribed in his name and he used to communicate with KING over the TARGET TELEPHONES.

for sales at the Trap House purchasers typically buy low levels of narcotics from a window on the side of the house, but do not actually enter the house. Further, in your Affiant's training and experience, it appears that KING is savvy to the need for security at the Trap House to ensure it is not raided by either law enforcement or other drug dealers attempting to rob the premises.

25. On May 19, 2019, at approximately 3:56 p.m., KING received an incoming call from MCCOLLUR a/k/a Block, who utilized the 619-496-3340 phone number. The following is a transcription of a portion of the conversation between KING and Block:

* * *

Block: 27 dimes and, 23 uh, well you know we got a whole [U/I] of it
KING: Ok
Block: ...uh, in a bag but it just it running real low
KING: Alright
Block: Alright

26. During the preceding conversation, your Affiant believes that BLOCK was informing KING that the trap house was running "real low" on narcotics.

27. On May 20, 2019, at approximately 8:36 a.m., KING sent an outgoing text message to Block. The content of the message read: "Damn block. Man it's like you just don't care man. You got to much going on this job ain't for you man. I got to bring someone else in after today."

28. Over the next few minutes, Block, utilizing the 619-496-3340 telephone number responded to KING that he understood and that "But trust me I got a lot of love fa you the game the whole organization I'm just tryna learn all i can I got u tho."

29. During the preceding text messages, your Affiant, through training and experience, believes that MCCOLLUR a/k/a Block was telling KING that he appreciated him, the drug game, and the entire drug organization.

30. On May 24, 2019, at approximately 10:23 a.m., KING, using TARGET TELEPHONE 3, received a text message from 786-227-7349, subscribed to Wilhemnia

NOTTAGE, who resided and worked in the Trap House. The message read, "25 more dimes left." Your Affiant, through training and experience, believes that NOTTAGE was informing KING she only had 25 more dime bags left of narcotics to sell at the Trap House.

31. On May 26, 2019, at approximately 8:52 a.m., KING, using TARGET TELEPHONE 3, made an outgoing call to NOTTAGE. NOTTAGE confirmed that she had "stayed the night there," which your Affiant believes is the Trap House, and KING asked what "I need over there," to which NOTTAGE responded "everything." Your Affiant believes that NOTTAGE was informing KING that they were low on narcotics at the Trap House and needed "everything." Later that day, at approximately 10:16 a.m.., law enforcement surveillance identified KING's Maserati outside of the Trap House.

32. On May 30, 2019, law enforcement aerial surveillance observed a white BMW car park outside of the Trap House. Aerial surveillance observed a female exit the vehicle, walk inside the perimeter fence, walk back to the BMW, and then reenter the vehicle. The BMW departed the Trap House, and aerial surveillance was maintained until a marked MDPD vehicle arrived behind the BMW. The MDPD marked vehicle conducted a traffic stop on the BMW. The occupant of the vehicle was identified as Subject 2. MDPD recovered crack cocaine and marijuana from inside of the BMW. Subject 2 related to law enforcement that she had approached the back window of the Trap House and purchased the narcotics for cash. Subject 2 further admitted that this was not the first time she had purchased narcotics at the Trap House.

33. Later that day, at approximately 8:49 p.m., KING received a call on TARGET TELEPHONE 3 from 786-454-6946: a phone number utilized by Keyon HARRIS. KING complained that he had visited the Trap House earlier and HARRIS was not there so KING needed

other subjects to cover his shift. During the call KING called HARRIS by his first name, Keyon, further identifying HARRIS as a member of the KING Enterprise working at the Trap House.

34. On May 31, 2019, at approximately 9:27 a.m. KING received an incoming phone call on TARGET TELEPHONE 2 from a number ending in 5067 used by Subject 3. During the call, Subject 3 explained that he had "kush" for sale at 550 for a Q, 11 for a half, and 22 for a whole plate. Your Affiant, through training and experience, believes that Subject 3 had pound quantities of marijuana to sell to KING. KING later met with Subject 3, who was driving a silver Chrysler and was observed outside of the Stash House. Law enforcement continued surveillance on the silver Chrysler and conducted a traffic stop. There, law enforcement recovered approximately four and a half pounds of marijuana and $4,378.00 US currency from compartments inside of Subject 3's van. Later that day, Subject 3 called KING over TARGET TELEPHONE 3 to inform KING that the marijuana and money had been taken by the police.

35. On June 1, 2019, at approximately 6:57 a.m., KING received an incoming text message from 786-227-7349, which is utilized by NOTTAGE. The content read: "Gm count off 2000 I dont if u added a extra 2000 some where its 8230 not 10230."

36. During the preceding text message, your Affiant believes that NOTTAGE had informed KING that the "count" for the money at the Trap House was incorrect for the day.

37. On June 2, 2019, at approximately 7:34 a.m., KING received an incoming call on TARGET TELEPHONE 3 from telephone number 786-318-4097, which is utilized by EVANS. The following is a transcription of a portion of the call:

KING: Hello
Evans: Umm I'm going to need i'm dry the only thing in here is some powder.
KING: oh ok
Evans: what is it looking like
KING: let me do the math

38. During the preceding call, law enforcement believes that EVANS was informing KING that the Trap House was low on narcotics and needed to be re-supplied.

39. On June 5, 2019, at approximately 9:15 a.m., KING received a call on TARGET TELEPHONE 1 from Subject 3 informing KING that law enforcement SWAT teams were executing search warrants in the Richmond Heights neighborhood. Minutes later, at approximately 9:22 a.m., KING made an outgoing telephone call to 786-227-7349, utilized by NOTTAGE. The following is a transcription of the call between KING and NOTTAGE:

NOTTAGE: hello
KING: hello I forgot you was over there..i called Corey…wha..you…uhh Corey[8] call you
NOTTAGE: no
KING: oh
NOTTAGE: Corey don't got my number
KING: oh ok ummm…. Well then clean up
KING: clean up, put everything together and I'm I'm I'm finna come get it right now
NOTTAGE: alright
KING: yea and just chill today…SWAT in umm Richmond Heights..alright
NOTTAGE: alright

From the preceding call, your Affiant believes that KING was telling NOTTAGE to clean up the Trap House and collect all the narcotics. KING stated that he would come pick up the narcotics and for NOTTAGE to shut down for the day because SWAT was in the Richmond Heights area.

40. On June 9, 2019, KING placed an outgoing call utilizing TARGET TELEPHONE 3 to 786-318-4097, utilized by Corey EVANS. KING complained to EVANS about another member of the enterprise who had fallen asleep while working in the Trap House. During this conversation, KING described the state of the Trap House upon arriving as:

KING: Door wide open, money everything, dope everything all over the floor.[9]

41. In this call, law enforcement believes that KING was explaining that he had arrived

[8] Your Affiant believes the reference to Corey is for Corey EVANS.
[9] This is a summary from the recording and not verbatim.

at the Trap House, and found that the member of the Enterprise who was employed to sell narcotics out of the Trap House was asleep and had knocked money and narcotics off of the table where they are stored.

42. On June 11, 2019, at approximately 7:42 a.m., KING received a call from EVANS who was utilizing phone number 786-318-4097. EVANS informed KING that they needed "everything." Based on your Affiant's training and experience, and involvement in the instant investigation, when KING is discussing "everything" it is a signal that he needs to resupply the Trap House with various types of narcotics.

## IV. CONCLUSION

43. Based upon the foregoing, I respectfully submit that from on or about October 18, 2018 through June 13, 2019, there is probable cause to believe that the defendants Tedrick KING, Wilhemnia NOTTAGE, Corey EVANS, Christopher MCCOLLUR a/k/a "Block," Keyon HARRIS, and Jonis WEBSTER a/k/a "J.J.," possessed with intent to distribute narcotics, and conspired to possess with intent to distribute narcotics, all in violation of Title 21, United States Code, Sections 841 and 846.

**FURTHER YOUR AFFIANT SAYETH NAUGHT**

Jarahn Williams
Special Agent, Drug Enforcement Administration

Sworn to and subscribed before me this
28th day of June, 2019 at Miami, Florida

HON. LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA